ROBERT V. GLOVER, plaintiff in error, *vs.* JOHN FISHER, junior, and SOLOMAN HAY, defendants in error.

*Appeal from Stephenson.*

In an ordinary contract for the sale of land, where credit is given, and a conveyance is to be made on the payment of the last instalment, where time is not expressly the essence of the contract, a Court of Chancery may, in its discretion, enforce the performance of such a contract, although the payments may not have been promptly made. But, in so doing, the Court will inquire into all the circumstances attending the delay, and the conduct of the parties.

A party who purchases land which another has contracted to convey, with a full knowledge of that fact, takes it subject to the rights and equities of the claimant.

This was a bill filed by the appellant, in the Stephenson Circuit Court, to compel a specific performance. The cause was heard on bill, answers and proof, by Sheldon, Judge, at the March term, 1850, of that Court, and the bill was dismissed. The appellant, complainant below, brought the cause to this Court, assigning for error the dismissal of the bill. The whole case is sufficiently stated in the opinion of the Court.

M. P. SWEET, for appellant.

MARSH & WIGHT, for appellees.

Opinion by Mr. Justice CATON:

This bill was filed by the purchaser, to compel the specific performance of a contract for the sale of land. The bill sets forth a contract, entered into between the parties, on the 19th of April, 1847, by which Glover agreed to pay Fisher, for the premises in question, two thousand one hundred dollars—of which, the sum of nine hundred dollars was to be paid at the execution of the agreement—four hundred dollars on the first day of October following—and the remaining eight hundred dollars on the first day of May, 1848; at which time Fisher agreed

to execute a conveyance, and until which time Fisher was to retain possession of the premises. The bill also avers, that, at the time of the execution of the agreement, the first payment of nine hundred dollars was made, the receipt of which is indorsed on the agreement; that on the 21st of June, 1847, Glover paid to Fisher, in part payment of the purchase money, the sum of two hundred and twenty dollars; that at the time of the execution of the agreement, Glover held a note, executed by the father of the defendant, for three hundred and thirty-nine dollars and some cents, which would mature shortly before the October payment would fall due, and that it was agreed between the parties that that note should be received by the defendant, in part payment of the purchase money, but that for the purpose of insuring promptness on the part of the maker of that note, Glover should retain possession of it; that the complainant, as well as his agent, William Glover, by whom the contract was made, resided, at the time, in Pennsylvania, to which place the agent returned, soon after the contract was executed, relying upon the Fisher note to complete the October payment, and intending to return in time to make the last payment, on the first of May. On that day, William Glover, the agent, tendered to the defendant the sum of six hundred and eighty-one dollars and eighty-eight cents, together with the said note, and demanded a deed, and that Fisher refused to receive the money and note, or to execute a conveyance; that, on the 14th of July, 1849, Glover tendered to the defendant the sum of one thousand and seventy dollars and sixty cents, in full payment of the purchase money and interest, and again demanded a deed, which the defendant refused to execute, or to accept the tender. The money last tendered was brought into Court with the bill.

The bill also avers, that Fisher, on the 8th day of March, 1849, conveyed the premises to the other defendant, Hay, who, at the time, was informed of the complainant's rights in the premises.

To that portion of the bill which avers the agreement to apply the Fisher note, the defendant Fisher pleads the statute of frauds. In his answer, he admits the making the agreement, as charged, but denies the receipt of the first payment of nine hundred dollars, as is alleged; but he avers, that the agent presented some old claims against him, consisting of two notes for one hundred dollars each, and an account for twenty-six dollars,

and, also, a note for one hundred dollars, executed by one Peter D. Fisher, which was not then due; that the amount of the principal and interest of these claims, together with the P. D. Fisher note, was four hundred and thirty-four dollars, and that the said defendant was induced to allow the sum of four hundred and sixty-six dollars, upon and towards the said first payment of nine hundred dollars, for no other consideration than as usurious and illegal interest. The amount of this portion of the answer is, that he denies that he received the nine hundred dollars, but that he agreed to consider it as paid, by allowing legal demands for four hundred and thirty-four dollars, and four hundred and sixty-six dollars, for the previous forbearance of the other claims, which he calls usury. He denies any agreement to take his father's note, in part payment, as is alleged; and even denies all knowledge of the existence of such a note. He admits the receipt of the two hundred and twenty dollars, on the first of May, as averred in the bill, to apply on the October payment; and admits, that, on the first of May, 1848, W. Glover called on him, and exhibited and counted some money, the amount of which he does not know, but believes it was five hundred and eighty-seven dollars and fifty cents; but is advised that what he did then did not amount to a tender, and states that Glover said, at the time, that he had not quite enough, but that he had fifteen days in which to get the balance, and that the defendant declined to accept the money offered. He denies that Glover then presented or offered the note, as stated in the bill.

The answer then avers, that soon after the defendant made the contract with Glover, he agreed to purchase a farm of one Kerr, for the sum of one thousand two hundred dollars, and agreed to make payment to Kerr at the same times that Glover had agreed to pay him, of which he informed Glover, and told him that he relied upon the money which he was to receive from him to meet his engagements with Kerr. That in August, 1847, he put in twenty-five acres of fall wheat, on the Kerr farm, at an expense of fifty dollars, and that, in consequence of Glover's failure to pay the balance of the October instalment, he was obliged to abandon the purchase from Kerr, by which he lost the expense of putting in the said wheat, and also the advantages of that purchase, which he believed to have been from five to eight hundred dollars. Admits the tender on the 14th of July,

1849, of one thousand and seventy dollars and some cents, and that he refused to execute a deed. Admits that he conveyed the premises to Hay, on the 8th of March, 1849. Says, that notwithstanding Glover's default, he was ready, willing and anxious to repay to the complainant all that he had advanced towards the payment of the two thousand one hundred dollars ; and to this end, the defendant and William Glover, in the month of March, 1849, had a reckoning of all the defendant had so received, when it was found that he had received, except for interest, as stated in the answer, the sum of five hundred and forty-six dollars, which the defendant then offered to repay to W. Glover, but that he refused to receive the same, but denies that he is now under obligation to pay the same.

The substance of Hay's answer is, that he purchased, with notice of the complainant's interest.

There is, in reality, but one really material averment in the bill which is fully and explicitly denied in the answer of Fisher, and that is the arrangement which was charged to have been made, by which the note of the defendant's father should have been taken in part payment of the purchase money. It was supposed upon the argument, that it was denied that the first payment of nine hundred dollars was made ; but this is not so. It is true, that Fisher's answer, at first, denies his having received " the sum of nine hundred dollars upon the first payment," but not feeling quite satisfied to leave the matter there, he goes on and gives his account of what, in fact, did take place, by which he shows that that payment was made to his satisfaction, and that his denial was nothing but the sheerest evasion or special pleading. If he can, in that way, reconcile his own conscience with such a denial, he cannot satisfy this Court by such literal expressions. He at last admits, in his answer, that he did receive, what, at the time, he understandingly and voluntarily agreed to accept, in full payment and satisfaction of that first instalment of nine hundred dollars, and at the very time, too, and as a part of the same arrangement, when the price of the property and terms of payment were agreed upon. It was a part of the same agreement, that nine hundred dollars should be paid down, and that it should be paid in the particular way set up in the answer. There is hardly an attempt to disguise that fact in his answer. But then he complains that he agreed

to allow four hundred and sixty-six dollars towards the nine hundred dollars, for the previous forbearance of certain advances, which were applied towards making up the balance of that first payment; and this four hundred and sixty-six dollars he calls usury. But in that there was no usury; it was rather a bonus. There was no previous corrupt agreement, or even understanding, that more than lawful interest should be paid; and, according to his own statement, he was under no sort of obligation or agreement to pay any part of that which he calls usury; but, for some cause—and to us the motive is immaterial—when he comes to settle up for the principal and legal interest, he voluntarily allows towards the first payment the further sum of four hundred and sixty-six dollars. The parties might, if they had seen proper, have agreed to call the first payment one thousand dollars, and that the purchaser should be allowed one hundred dollars, because he was a clever man, or for his good looks, or any other fanciful consideration, and yet, we imagine, it would be considered a good payment, so long as it was a part of the agreement, by which the price was fixed, that it should be thus paid. There is little doubt that if Fisher had not agreed to allow the bonus of four hundred and sixty-six dollars, that then the first payment would have been fixed at four hundred and thirty-four dollars, when the result would have been the same.

But while engaged with this part of the defendant's answer, we may as well dispose of another consideration connected with it. All the evidence in the case shows, that the defendant, in his answer, has designedly distorted, if he has not wilfully misrepresented the facts from which that first instalment was agreed to be satisfied. It is shown, beyond all controversy, by the testimony of three or four witnesses, that the two advances of one hundred dollars each, made in 1837 and 1839, by William Glover, to the defendant, were made for the express purpose of being invested in the purchase of land, for the mutual benefit of the parties, and that the identical land in question had been purchased with the money thus advanced. At the time the money was advanced, receipts were given, showing the use to which it should be applied. And these are what the defendant calls old claims—consisting of notes given in 1837 and in 1839. A susceptible conscience, certainly, would have prompted him to have told the whole truth, and explained upon what terms these advan-

ces were made. As to the facts, thus far, there can be no doubt, and it is equally clear that they must have been in the recollection of the defendant when he made his answer, for several of the witnesses speak of having learned them from the defendant's own lips recently. But this is not all. The testimony of William Glover explains how this sum of nine hundred dollars was made up, from what the defendant pretends was so small a fund. He says, that he had previously transferred his interest in those receipts to his brother, the complainant, as whose agent he came out to settle up the business. The parties could not agree as to the relative proportions of their respective interests in the premises, the defendant having resided upon and improved the land. They finally agreed to leave the matter to the decision of the defendant's father, who decided the farm to be worth two thousand one hundred dollars; that if the defendant kept it, he should pay the complainant eight hundred dollars; and that, if the complainant bought it, he should pay the defendant one thousand three hundred dollars; and that, thereupon, it was agreed that the complainant should take the premises upon those terms. Here we see that the arbitrator fixed the value of the complainant's interest in the premises, which had originated in the advances made by William Glover, and with which the premises had been durchased, at eight hundred dollars, and that with that and the one hundred dollar note, the first instalment, called nine hundred dollars, had been made up. Now, if this account, given by William Glover, is true, then every thing about the first payment is plain and easily understood. In the material parts of this statement, Glover is corroborated by Clinkner, who testifies, that in July, 1848, the defendant told him that Glover's interest in the farm was reckoned at eight hundred dollars, and that with that and the P. D. Fisher note, the first payment, of nine hundred dollars, was made, which was indorsed on the agreement. The manner in which they arrived at the value of that interest, was, comparatively, of little moment—the existence of that interest being the important fact. That arbitration, and the award, were not facts to establish which the testimony of two witnesses was required. They were not substantive facts, upon which the party relied as a ground of relief. They arose incidentally, and became material only for the purpose of establishing the existence of, or explaining a certain other fact, which is averred in the bill,

and upon which reliance is placed. That fact is, the payment of the first instalment, called nine hundred dollars. It may be true, that the answer inferentially denies this whole statement given by William; but, if so, it is by giving another statement, which is inconsistent with it. But that statement is new matter, introduced into the answer, in explanation of a denial of an averment in the bill, and is not, of itself, responsive to the bill. The answer is not evidence of such new matter, and, certainly, it is competent to prove a different statement of facts, by the testimany of one witness, and William Glover's testimony would be sufficient, of itself, if it were unsupported by Clinkner.

It has been already stated, that the answer denies the statement in the bill that it was agreed that the note of John Fisher, senior, for about three hundred and thirty-nine dollars, should be received in part payment of the purchase money. In support of this averment in the bill, there is only the testimony of William Glover, unsupported by circumstances established by other proof sufficient to overcome the answer. This averment, then, is not established. After the payment of two hundred and twenty dollars, made on the first of June, which was properly applicable to the October instalment, there remained the sum of one hundred and eighty dollars, which should have been paid on the first day of October. This was not paid; nor do we again hear of the complainant or his agent till the first of May following, when the last instalment, of eight hundred dollars, fell due. At that time the agent again appeared, and tendered to the defendant about the sum of six hundred dollars. We say about that sum, for the precise amount of that tender is not clearly established. We lay out of view the inquiry, whether the note of John Fisher, senior, was tendered at that time or not, for, as we have seen, the defendant was not bound to receive it, and, hence, it is immaterial whether or not it was embraced in that tender. The defendant refused to accept the money or to execute a deed, assigning as a reason, according to the testimony of one witness, that the complainant had not made the October payment, as he had agreed. The whole conduct of the defendant shows that he relied upon that failure to entitle him to the forfeiture of the money which had been already paid, as we shall more fully see hereafter, although another witness states that at the time of the tender the defendant complained that the

tender was insufficient. On the 16th of July, 1849, William Glover tendered to the defendant the sum of one thousand and seventy dollars and sixty cents, and again demanded a deed, with the like result.

This is an ordinary contract for the sale of land, where a credit is given for a part of the purchase money, and a conveyance to be executed upon the payment of the last instalment. There is nothing in the contract attaching any peculiar importance to the day set for the payment of the balance of the purchase money, or, as it is usually termed, expressly making time of the essence of the contract. When called upon to enforce the specific performance of such a contract, it is not, at this day, a question open to discussion, that a Court of Chancery may, in the exercise of a sound legal discretion, overlook the day named for performance, or may excuse the want of strict punctuality in the payment of the purchase money, according to the terms of the agreement, where fair dealing and good conscience seem to require it. In such a case, the Court may, in the exercise of such a discretion, either compel the vendor to go on and execute the contract, by making a conveyance, or compel him to refund the purchase money which has been already advanced. In the exercise of such a discretion, it is necessary to consider the extent of the delay, the amount which had already been paid, and all the circumstances developed, which may have influenced, excused or justified the party, in neglecting punctuality in the payments. Where there can be no excuse for the delay, but it is manifest that the purchaser has wantonly and in the exercise of his arbitrary will or caprice, refused to pay at the time, when he had the means and could have done so as well as not, he cannot, with any propriety, ask the Court to excuse him for his wilful disregard of the specified terms of his obligation, no matter how soon he may have repented of his perverseness, and offered to perform. But such is not this case; nor, indeed, do such cases often occur. In this case, over half of the price agreed upon was paid punctually, and a portion of it some months before it became due. Of the October instalment, two hundred and twenty dollars was paid four months before it fell due, and the remaining one hundred and eighty dollars was delayed till the first of May following, when the last payment became due. At that time a tender of, say six hundred dollars, was made—

85

about three hundred and eighty-six dollars less than the amount then remaining unpaid. This tender the defendant refused to accept, not alone because it was too little, but partly, at least, because the one hundred and eighty dollars had not been paid on the first of October previous, when it fell due. Was that a sufficient reason for his refusal to accept the money? It seems to us that a pretty satisfactory excuse is found upon this record, why the complainant is not liable to reproach for the want of punctuality in paying the balance due on the first of October, and even for his not having made a sufficient tender on the first of May following. Now, although we are bound to say, by the rules of evidence which govern this Court, that it was not mutually agreed between the parties that the note of John Fisher, senior, should be taken in part payment of the purchase money, yet it is manifest that the complainant understood that such was the agreement, for his agent, who transacted the business for him, positively swears that such was the case. Both the complainant and his agent resided in Pennsylvania, and were there at the time the October payment fell due, and till late in the following April. It is not remarkable that they should both have rested in perfect security, as to the small balance due on that payment, relying upon their understanding of the agreement. And the same consideration applies to the tender made on the first of May; for, if the note could be included, we should see that that tender was sufficient, or nearly so; and the defendant did not put his refusal alone upon the ground that a sufficient amount was not then tendered. In determining this question of excuse, the Court may take into consideration any mistake, accident or misfortune, which may have caused or induced the delay. In this case, there is another circumstance, which does not properly come under either of the above heads, and yet we think it may not be entirely overlooked. We have seen that considerably more than half of the October instalment was paid four months before it was due, and the complainant, although conscious that he had no legal right to ask it, may well have supposed that the defendant would not be very exact in insisting upon the strictest punctuality in the payment of the balance of that instalment. At least, such consideration would be most likely to enter into the motives and influence the actions of most men of the class and occupation of these parties, among whom at

want of strict punctuality is not considered so great a fault as it is among bankers and in commercial circles. We are to look to the motives of men, and, if they have acted honestly, the Court may overlook even their negligence, unless the contract expressly stipulates a forfeiture. There is, certainly, no difficulty in this case in excusing the complainant for his default in relation to the October payment; nor do we want a reasonable explanation why the tender made on the first of May was of an insufficient amount. Had the complainant, immediately after that time, made a sufficient tender, and demanded a deed, his right to a specific performance would scarcely admit of a question. But he delayed more than fourteen months, before he again presented himself with the full amount due. For this delay, then, is he to suffer this forfeiture? We think not. In determining this question, we must look at the conduct and motives of both parties. There is nothing to show that the delay originated in a design on the part of the complainant to abandon the contract, while there are many circumstances tending strongly to show that it was the desire and the design of the defendant to enforce a forfeiture against the complainant of what had already been paid, rather than to obtain, in good faith, an execution of the contract. The defendant complains, that, by reason of the default of the complainant, he was obliged to abandon his purchase of the Kerr farm—which, he says, was a very advantageous bargain—as well as twenty-five acres of wheat, which he had put in on that place, at an expense of fifty dollars. That the Kerr property was worth from five to eight hundred dollars more than he had agreed to give for it; and with this loss he charges the complainant. Let us see how this is. Shortly after the sale to Glover, Fisher contracted to purchase the Kerr farm, which is situated in Wisconsin, for one thousand two hundred dollars, and agreed to make payments at the same times that Glover was to pay him; that is, five hundred dollars on the first day of October, and seven hundred dollars on the first day of May. In September, after Glover had paid two hundred and twenty dollars of the October instalment, and before that instalment had become due, Fisher told the witness Snyder, that he "had thrown up his contract for the Kerr farm, and held the amount that he had received from Glover as damages." On the first day of October, Fisher went to Kerr, and told him that

Glover had disappointed him, and that he could not meet the payment; and, thereupon, they agreed to rescind and destroy their contract; which was done. And now he asks that the complainant should be made to bear the consequences of that recession. The complaint, that he was compelled to abandon that purchase, because Glover had failed to meet the whole of the October payment, is a sheer pretence, for at the time he abandoned that purchase, Glover was not in default, and he did not know that he would be. Indeed, at that very moment, while he was in Wisconsin, rescinding his contract with Kerr, for aught that he knew, Glover was at his house, in Illinois, with the money. He had previously determined to abandon that contract, at all events, and then to seek some pretence to throw the responsibility upon the complainant, for we find him, some days before, in a conversation with Snyder, declaring that he had already thrown up his contract for the Kerr farm. He was not, therefore, compelled to abandon that purchase on account of Glover's default. The most that can be asked for him is, that he gave up that purchase because he violently suspected that Glover would make default. But that will not help him. As well might Fisher have burned his own barn, and then charged Glover with it, because he really believed that Glover would have burned it, if he had not. Besides, if Fisher had really desired to carry into execution both contracts, he would certainly have applied to Kerr for an extension of time, at least, till he could hear from Glover, and learn what he intended to do. Nor is it probable, in any event, that Fisher would so readily, without a struggle or an effort, have yielded up a bargain, worth from five to eight hundred dollars, for the want of only one hundred and eighty dollars, unless he had had some ulterior object in view. We are not at a loss to discover that object, for he has told us himself, that his design was to obtain a forfeiture; that he designed to retain the one thousand one hundred and fifty dollars which Glover had paid him, and, also, to retain the land. The very design is odious to equity, when the result is attempted to be brought about by the conduct or management of the party claiming the forfeiture. If one party sustains an inevitable loss, by the default of the other, then it is but just that he should be compensated for it; but he must see to it that he himself has not, either by his folly or by design, contributed to the loss of which

he complains. The whole of this transaction, out of which the defendant claims to have suffered so much, and which he seeks to charge to the complainant, leaves an unfavorable impression upon the mind of the fairness of the defendant's intentions in carrying out the contract of sale. It is true, that the defendant did not receive the nine hundred dollars in cash, but if he is allowed to retain the land, he receives what is equivalent to that amount, for that was made up of a note for one hundred dollars and an equitable interest, to the amount of eight hundred dollars, which the complainant had in the premises sold. It would be unconscionable to let the defendant retain the premises, discharged of this interest, as well as the money which the complainant has already advanced. But it is not to be denied that Glover has been guilty of negligence, and, to a certain extent, knowingly, in not having made the payments according to his agreement. Although it appears that the complainant supposed that the note of John Fisher, senior, was to be taken in part payment of the purchase money, yet it also appears that William Glover, at one time, at least, did not contemplate completing the October payment by an application of this note, for, at the time, he told H. S. Barber to collect and pay the two hundred and twenty dollars, he said he would send a draft for the balance; and again, at the time he made the tender, in May, when informed that he did not tender enough, he seems to have admitted it was so, for he said he had fifteen days to make the balance in. While these circumstances may not put the complainant beyond the pale of relief, they make it proper to impose terms upon him, which would not be allowable if he had been guilty of no default. The further delay of fourteen months is against him; but of that the defendant has had no great cause to complain, for, in the meantime, he has possessed and enjoyed the premises, as well as the use of over half the purchase money; and for the last year, at least, the complainant has laid out of the use of both. We think, on the whole case, that justice and good conscience require, that we should direct a specific performance of this contract; but the complainant will have to pay all the costs in the Circuit Court.

The conveyance of the premises to the defendant Hay presents no impediment, for he purchased with full notice, and took an indemnity from Fisher against this very claim. As the Cir-

cuit Court can, more conveniently, carry into effect the decree which should be rendered, the decree of that Court, dismissing the bill, must be reversed, with costs, and the suit remanded, with directions to the Circuit Court to enter a decree, in due form, annulling the conveyance from Fisher to Hay, and decreeing a conveyance from Fisher to the complainant, and, upon the execution of such conveyance, authorizing Fisher to withdraw the deposit.    The decree must, also, adjudge the costs of the Circuit Court against the complainant.

*Decree reversed.*

NOTE, BY THE REPORTER.—Mr. Justice TRUMBULL, in consequence of severe indisposition in his family, was absent during a part of the Ottawa term, and, therefore, did not participate in the decision of all the cases heard and determined at that term.